**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dennis Enriquez, | No. CV-19-04382-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| City of Scottsdale, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgement ("MSJ"), (Doc. 149), which has been fully briefed by the parties, (*see* Docs. 143; 156; 157; 158; 165).  The Court held oral argument on April 28, 2022.  After considering the parties' briefing and arguments, as well as the relevant caselaw, the Court will grant Defendants' MSJ for reasons explained below.

**I.      BACKGROUND**

The fulcrum of this case is the alleged race and gender discrimination purportedly perpetrated by Defendant City of Scottsdale (the "City") and Defendant Jeffrey Nichols (collectively, the "Defendants") against Plaintiff Dennis Enriquez.

**A. Parties and Employment History with the City**

Plaintiff worked for the City for 26 years, and earned multiple promotions during that time.  (Doc. 143 ¶¶ 29–33 (hereafter, "DSOF"); Doc. 157 ¶ 3 (hereafter, "PSOF")).  In 2011, Plaintiff was promoted to the position of Customer Service Director.  (DSOF ¶ 33; PSOF ¶ 3.)  Two years later, his title was changed to Business Services Director ("BSD"),

which is the head of the Business Services Department.  (DSOF ¶¶ 3, 33; PSOF ¶ 3.)
Plaintiff served as the BSD from May 2013 through September 2016.  (Doc. 149 at 2.)  In
this role, he reported to Defendant Nichols—who then served as the City Treasurer,
managing and supervising the Business Services Department, as well as other departments.
(DSOF ¶¶ 4, 35; PSOF ¶ 5.)

Like many government employers, the City sometimes used contract workers to fill
its positions.  (DSOF ¶ 25.)  These workers were employees of the contracting agency—
not the City—and were at-will employees.  (*Id.* ¶¶ 25–56.)  Notably, it was possible for an
employee to retire from the City, collect a pension from the Arizona State Retirement
System ("ASRS"), and then be rehired as a contract worker through a third-party, such as
ARCO Service Corp.[1]  (*Id.* ¶ 27.)

Plaintiff retired in September of 2016.  (DCOF ¶ 52; PSOF ¶ 10.)  Before retiring,
Plaintiff spoke with Defendant Nichols, as well as the City's Human Resource Department
("HR"), about the possibility of his retiring and being rehired as a contract worker.  (DSOF
¶ 53; PSOF ¶ 10.)  Nichols believed that keeping Plaintiff on would be helpful because
Plaintiff was leading the effort to implement the changes caused by recent state legislation,
HB 2111.  (DSOF ¶ 58.)  Consequently, Defendant Nichols decided to rehire Plaintiff and
lobbied Acting City Manager, Brian Biesemeyer, to approve it—which he did.  (*Id.* ¶¶ 58–
60.).  They completed the necessary paperwork, which authorized Plaintiff to work as a
contractor for one year, with his contract expiring on September 11, 2017.  (*Id.* ¶¶ 63–64;
PSOF ¶ 11.)

**B.  The 2017 BSD Selection Process**

A few months before the expiration of Plaintiff's one-year contract, the City began
the process of conducting a competitive recruitment for the BSD position, for which
Defendant Nichols was the hiring authority.  (DSOF ¶ 70; PSOF ¶ 31.)  Plaintiff alleges
that Defendant Nichols refused to appoint Plaintiff to the position "on a permanent basis
without benefit [the] of participating in a selection process."  (PSOF ¶ 15.)  Defendants

---

[1] ACRO is a third-party that hires employees to provide services to the City.  (DSOF ¶ 67.)

contend that the decision to conduct an external recruitment was made by both Defendant Nichols and Ron Fasano, the assigned HR analyst.  (DSOF ¶ 73.)  They further contend that this decision was made because Plaintiff, as the employee of a third-party contractor, would be ineligible to apply if the City conducted an internal recruitment.  (*Id.*)

The incoming applications were screened by HR for minimum qualifications.  (*Id.* ¶ 78.)  Then, Defendant Nichols selected ten individuals—including Plaintiff—for the first round of interviews, in which Defendant Nichols did not participate.  (*Id.* ¶¶ 79, 82.)  Although Plaintiff acknowledged that the first interview "certainly wasn't [his] best," (*id.* ¶ 83), the first panel advanced his candidacy along with that of Lisa Bredeson, Heather Pfiefer, and Darcy Nichols,[2] (*id.* ¶¶ 84–85).

The second interview panel consisted of Bill Murphy, Brad Hartig, and Defendant Nichols.  (*Id.* ¶ 88; PSOF ¶ 34.)  Defendants contend that all interviewers believed that Plaintiff performed poorly and failed to answer job-specific questions, which he had a unique advantage in answering because he was currently serving in the position.  (*See* DSOF ¶¶ 94–98, 101.)  However, Plaintiff alleges that (1) Defendant Nichols designed the questions to weaken Plaintiff's candidacy, (2) that the questions were subjective, and (3) that the panel failed to ask job-specific questions.  (*See* PSOF ¶¶ 46–49.)

According to Defendants, the panel unanimously agreed that the top candidates were Lisa Bredeson, followed by Darcy Nichols, (DSOF ¶ 100), and that Plaintiff ranked last among the candidates, (*id.* at 101).  Plaintiff contends—without evidence—that the panel did not rank the candidates.  (PSOF ¶ 50.)  Defendants contend that Ms. Nichols was eminently qualified, (Doc. 149 at 11), but Plaintiff contends that she was not, (PSOF ¶ 39).  In any event, the panelists decided that the City would make an offer to Lisa Bredeson and, if she declined, the City would make an offer to Darcy Nichols.  (DSOF ¶ 103.)  Ultimately, Bredeson did decline, but Ms. Nichols accepted the offer.  (*Id.* ¶¶ 105–06.)

### C. Plaintiff's 2017 Termination

Plaintiff's ACRO contract was set to expire on September 11, 2017.  (*Id.* ¶ 110.)

---

[2] Darcy Nichols is not related to Defendant Nichols.  (DSOF ¶ 85.)

However, Ms. Nichols could not start until October 2, 2017, so Defendant Nichols asked Plaintiff to continue as a contract employee until the end of September.  (*Id.* ¶ 111; PSOF ¶ 60.)  Plaintiff agreed.  (DSOF ¶ 111.)  However, Plaintiff's contract extension was terminated early, on September 14.  (*Id.* ¶ 116; PSOF ¶ 61.)  The parties offer differing reasons for this early termination.

Defendants explain that Plaintiff was terminated because of unrest among the employees, who Defendant Nichols believed needed time to heal from the loss of Plaintiff as their leader.  (DSOF ¶ 115.)  Defendant Nichols believed this to be the case because employees—upon learning that Plaintiff was not selected for the BSD position—protested by plastering large pictures of Plaintiff's head in the upper-level office windows.  (*Id.* ¶¶ 112–13.)  Even Plaintiff acknowledged that this was inappropriate and asked that the employees cease.  (*Id.* ¶ 114.)  Plaintiff, however, insinuates that Defendant Nichols fired him because of a public records request that Plaintiff had made days earlier.  (*See* PSOF ¶ 61.)  Defendant Nichols contends that he was unaware of Plaintiff's request.  (DSOF ¶ 119.)

### D.  Plaintiff's 2017 Charge of Discrimination and Lawsuit

On October 23, 2017, Plaintiff submitted a Charge of Discrimination ("First EEOC Charge") with the Arizona Attorney General's Office ("AZAGO") and the Equal Employment Opportunity Commission ("EEOC").  (Doc. 143-5 at 9.)  Therein, Plaintiff asserted that he was subjected to unequal treatment based on his race (Hispanic) and sex (male).  (*Id.*)  The AZAGO issued its Notice of Right to Sue Letter on July 25, 2018, and a Dismissal Notice on September 5, 2018.  (*Id.* at 11–12.)  The EEOC issued a Notice of Right to Sue on February 13, 2019.  (*Id.* at 14.)  Shortly thereafter, Plaintiff filed this suit.  (Doc. 1.)

### E.  The 2020 Hiring for the BSD Position

In the first part of 2020, and while this suit was pending, Defendant Nichols announced his retirement.  (*See* DSOF ¶ 151.)  Judy Doyle was then appointed as Acting City Treasurer, effective October 1, 2020.  (*Id.* ¶ 152; PSOF ¶ 78.)  After Ms. Doyle's

appointment became effective, Darcy Nichols resignation from her position as BSD also became effective.  (DSOF ¶ 154; *see also* PSOF ¶ 77.)  Shortly after that, Plaintiff's attorney submitted a settlement offer to Defendants' counsel, demanding that Plaintiff be reinstated as the BSD.  (DSOF ¶ 155.)  Around this time, a local newspaper published an article that indicated Plaintiff wished to be reinstated as the City's BSD.  (PSOF ¶ 79.)  The City declined the settlement offer, and did not reinstate Plaintiff.  (DSOF ¶ 155).

The City then began the process of filling the BSD position through a competitive recruitment.  (Doc. 149 at 13.)  Judy Doyle was the hiring authority, and Sue Sola was the assigned HR representative.  (DSOF ¶ 156.)[3]  Ms. Doyle decided to conduct an internal recruitment—only open to current City employees.  (*Id.* ¶ 157.)  Defendants contend that she made this decision because she was confident that the City had a strong internal applicant pool capable of filling the position.  (*Id.* ¶ 158.)  They likewise contend that Ms. Doyle was not aware of Plaintiff's settlement offer.  (*Id.* ¶ 160.)  Plaintiff conversely contends that Ms. Doyle was aware of the newspaper article, which contained information about Plaintiff's lawsuit, as well as his desire to be rehired.  (See PSOF ¶ 79–80.)

The 2020 recruitment generally mirrored the 2017 recruitment.  (*See* DSOF ¶¶ 163–66).  Ultimately, Ms. Doyle selected Whitney Pitt, who Defendants contend was highly qualified for the position.  (*Id.* ¶ 167–69.)

### F.  Plaintiff's 2020 Charge of Discrimination

In December of 2020, Plaintiff submitted a second Charge of Discrimination ("Second EEOC Charge"), alleging retaliation in violation of Title VII.  (Doc. 143-5 at 85–86.)  Therein, Plaintiff alleged that the City decided to conduct an internal hiring process

---

[3] Although Plaintiff attempts to contest this fact, (*see* Doc. 158 at 17), he fails to do so.  Said failure is a reoccurring theme throughout Plaintiff's Controverting Statement of Facts, wherein Plaintiff—though claiming to controvert facts—fails to allege facts that actually contradict those asserted by Defendants, fails to provide evidence to bolster certain facts, and asserts facts that are not represented by the underlying evidence.  (*See generally id.*)  Although the Court will not remark on every instance in which Plaintiff does this—because they are too numerous and not often relevant to the case's outcome—the Court acknowledges that Plaintiff has played fast and loose with the facts of this case.

1   for the 2020 BSD opening—thereby excluding Plaintiff—because Plaintiff had filed both

2   the First EEOC Charge and the instant lawsuit.  (*Id.*)

3         Plaintiff was issued a Notice of Right to Sue on March 4, 2021.  (*Id.* at 88.)  He then

4   submitted his Second Amended Complaint ("SAC"), adding a retaliation claim based on

5   the same allegations undergirding the Second EEOC Charge.  (Doc. 137 ¶¶ 40–41.)

6   **II.   LEGAL STANDARD**

7         Summary judgment is appropriate when "there is no genuine dispute as to any

8   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

9   56(a).  A material fact is any factual issue that might affect the outcome of the case under

10  the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

11  A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could

12  return a verdict for the non-moving party.  *Id.*  "A party asserting that a fact cannot be or

13  is genuinely disputed must support the assertion by . . . citing to particular parts of

14  materials in the record" or by "showing that materials cited do not establish the absence or

15  presence of a genuine dispute, or that an adverse party cannot produce admissible evidence

16  to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  The court need only consider the

17  cited materials, but it may also consider any other materials in the record.  *Id.* at 56(c)(3).

18  Summary judgment may also be entered "against a party who fails to make a showing

19  sufficient to establish the existence of an element essential to that party's case, and on

20  which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

21  317, 322 (1986).

22        Initially, the movant bears the burden of demonstrating to the Court the basis for the

23  motion and "identifying those portions of [the record,] which it believes demonstrate the

24  absence of a genuine issue of material fact."  *Id.* at 323.  If the movant fails to carry its

25  initial burden, the non-movant need not produce anything.  *Nissan Fire & Marine Ins. Co.*

26  *v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  If the movant meets its initial

27  responsibility, the burden then shifts to the non-movant to establish the existence of a

28  genuine issue of material fact.  *Id.* at 1103.

The non-movant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).   However, in the summary judgment context, the Court believes the non-movant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).   If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

## III.   DISCUSSION

Plaintiff's SAC asserts the following: (1) a Title VII failure-to-hire claim against the City based on race; (2) a Title VII retaliation claim against the City based on the 2017 selection and the failure-to-reinstate in 2020; (3) a §1981 disparate treatment claim against all Defendants, which is also based on race; and (4) a § 1983 Equal Protection claim alleging a policy and practice of racial and sexual discrimination.  (Doc. 137 at 11–12.) Plaintiff seeks both compensatory and punitive damages. (*Id.* at 13.)

### A.  Racial or Gender Discrimination Under Title VII or 42 U.S.C. § 1981.

"Title VII prohibits employers from discriminating against any individual on the basis of race, color, religion, sex, or national origin." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019) (citing 42 U.S.C. § 2000e-2(a)(1)).   Courts "analyze Title VII claims, as well as § 1981 . . . employment discrimination claims, under the *McDonnell Douglas* burden-shifting framework." *Id.*

Under *McDonnell Douglas*, a plaintiff alleging discrimination must first establish a prima facie case. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

(1973)).  This requires that the plaintiff show "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Id.* "Once the prima facie case is made, a presumption of unlawful discrimination is created and the burden shifts to the defendant to articulate a 'legitimate, nondiscriminatory reason' for its action." *Weil*, 922 F.3d at 1002 (quoting *McDonnell Douglas*, 411 U.S. at 802).  "If the defendant meets that burden, the plaintiff must produce evidence that the defendant's 'proffered nondiscriminatory reason is merely a pretext for discrimination.'" *Id.* (quoting *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005)).

### 1. Prima Facie Showing

"Under the *McDonnell Douglas* framework, the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Chuang*, 225 F.3d at 1124 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)) (cleaned up). "This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996)).

Here, although Defendants concede that Plaintiff has established the first three elements necessary to make a prima facie case of discrimination, they argue that Plaintiff has failed to establish the fourth element—that similarly situated individuals outside his protected class, also called "comparators," were treated more favorably.  (Doc. 149 at 16.) Plaintiff responds that he has presented numerous comparators.  (Doc. 156 at 6–8.) Although Plaintiff has presented multiple proposed comparators, the Court is not persuaded that the proffered individuals are similarly situated to Plaintiff.

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Beck v. United Food & Com. Workers Union, Loc. 99*, 506 F.3d 874, 885 (9th Cir. 2007) ("We agree with our sister circuits that whether two employees are similarly situated is ordinarily

a question of fact.").  However, the Ninth Circuit has upheld grants of summary judgement where a Plaintiff failed to present evidence of similarly situated individuals that were treated differently.  *See, e.g.*, *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010) (affirming a district court's grant of summary judgement on a discrimination claim where Plaintiffs failed to present individuals who were "similarly situated" to themselves); *Fried v. Wynn Las Vegas, LLC*, No. 20-15710, 2021 WL 5408678, at *1 (9th Cir. Nov. 18, 2021) ("Because [the plaintiff] did not show that [the Defendant] treated him differently than a similarly situated employee of the opposite sex, he did not establish a prima facie case of sex discrimination.").

"Employees are similarly situated to the plaintiff when they have similar jobs and display similar conduct."  *Fried*, 2021 WL 5408678, at *1 (quoting *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011)) (cleaned up).  "The employees need not be identical, but must be similar in *material respects*."  *Earl*, 658 F.3d at 1114 (emphasis added).  Yet "it is 'important not to lose sight of the common-sense aspect' of the similarly situated inquiry," which "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees."  *Id.* at 1114–15 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.2007)).

Here, Plaintiff's job title was Business Services Director, which is a director-level position with supervisory responsibilities.  Plaintiff's relevant conduct is that he retired, was re-hired as a full-time contract employee, participated in a competitive process for a supervisory position, and was not selected for that position.  Defendants contend that Plaintiff "cannot identify a single individual who retired, worked as a contract employee, and was re-hired into a Director-level [sic] position without a competitive recruitment." (Doc. 149 at 17.)  Plaintiff responds that he has properly identified "employees who retired and were rehired to positions which, he asserts are, [sic] similarly situated without enduring competitive recruitment or selection processes."  (Doc. 156 at 6.)  The Court agrees with Defendants.

Plaintiff's proposed comparators are problematic because they either had dissimilar

jobs, or displayed dissimilar conduct, or both.  Gina Kirkland, for example, *never retired* from the City and, consequently, was *never re-hired* by the City but was instead "promoted" to her director-level position.  (Doc. 143-5 at 34–35.)  David Meinhart left the City's employ for four years, returned as a *part-time* contractor, and applied for—and eventually obtained—a *non-supervisory* position that was several levels below his previous director-level position.  (*Id.* at 37–38.)  Gary Meyer retired, left the City's employ for two years, and was rehired to a *non-supervisory*[4] position through a *competitive hiring process*.[5] Plaintiff's remaining comparators were all employed (several of them part-time) in highly dissimilar roles—such as I.T. or secretarial roles—and none of them were employed in supervisory positions.[6]  (*See* Doc. 149 at 18 n. 5).  Because Plaintiff has not presented

---

[4] Plaintiff's contention that this was a supervisory position is unsupported by the facts. Plaintiff cites to Exhibit 69 to bolster this factual assertion, (PSOF ¶ 23), but attaches no Exhibit 69, (*see* Doc. 157-7 at 102 (stopping at Exhibit 68)).  If Plaintiff meant to cite to Exhibit 68, the Court would remain unpersuaded.  First, Exhibit 68 is a job posting for a "Project Manager," (*id.* at 100), but Mr. Meyer was a *Senior* Project Manager, (Doc. 143-5 at 40–41).  Thus, the document provides little insight into the Senior Project Manager position.  Second, to the extent the document does inform the Court about the Senior Project Manager position, it only provides that the Project Manager "[w]orks under the *general direction* of the Senior Project Manager."  (Doc. 157-7 at 101.)  Therefore, it is unclear from Plaintiff's own evidence that the position is a supervisory one, (*id.*), and Defendants offers evidence clearly showing that it is not, (*see* Doc. 143-5 at 41 ("The Senior Project Manager position does not supervise other employees.")).

[5] Plaintiff's contention that Mr. Meyers was hired through a non-competitive process is, likewise, belied by the facts.  The hiring manager, David Lipinski, has declared that there was an "open recruitment" for the position, that a three-judge panel evaluated those candidates, and that the panel ultimately found Mr. Meyers to be the most qualified.  (Doc. 143-5 at 40–41.)  Yet, in his declaration, Plaintiff asserts that Mr. Meyers "stated that he was appointed to the position without benefit of a competitive interview selection process." (Doc. 157-7 at 78.)  Putting aside the self-serving nature of this hearsay statement, this proffered fact does not rebut the facts provided by Defendants.  At best, it demonstrates that Mr. Meyers was *unaware* of the competitive nature of the process, which does not mean the process was not actually competitive.

[6] The remaining comparators include Annette Gove, Amy Foster, Mariana Gandy, Jan Horne, and Kristy King—all of whom Defendants challenged as deficient in their MSJ based upon their dissimilar jobs.  (Doc. 149 at 18 n. 5).  Plaintiff made no attempt, either in briefing or argument, to explain how these proposed comparators' dissimilar roles did not disqualify them from being used as comparators.  (*See* Doc. 156 at 6–8.)

1  individuals who are similarly situated to himself, he cannot establish that similarly situated

2  individuals were treated differently than himself.  *See Fried*, 2021 WL 5408678, at *1.

3  Consequently, the Court finds that Plaintiff has not provided proper comparators

4  and, thereby, has failed to establish a prima facie case of discrimination.  However, because

5  Plaintiff's burden of proof is incredibly low at this step, *Chuang*, 225 F.3d at 1124, and

6  because the issue of deficient comparators can also be relevant at the third step of the

7  *McDonnell Douglas* framework, *see Hawn*, 615 F.3d at 1158 ("The concept of 'similarly

8  situated' employees may be relevant to both the first and third steps of the *McDonnell*

9  *Douglas* framework."), the Court will continue its analysis of Plaintiff's discrimination

10 claim—proceeding, *arguendo*, as if Plaintiff had established a prima facie case.[7]

## 2.  Legitimate, Non-Discriminatory Reason

12 Assuming that Plaintiff could establish a prima facie case of discrimination, "[t]he

13 burden of production, but not persuasion, then shifts to the employer to articulate some

14 legitimate, nondiscriminatory reason for the challenged action."  *Chuang*, 225 F.3d at

15 1123–24.  Regarding their decision to conduct a competitive hiring process and not directly

16 appoint Plaintiff, Defendants explain that "Acting City Manager Brian Biesemeyer did not

17 want to start a precedent in which employees could retire, go on contract for one year, and

18 then be rehired into the exact same job as a City Employee."  (Doc. 165 at 6.)  Regarding

19 their decision to hire Darcy Nichols instead of Plaintiff, Defendants contend that "she

20 performed far better than [Plaintiff] in her interview."  (Doc. 149 at 19.)

21 The Court finds that Defendants have met their burden of production by providing

22 legitimate, nondiscriminatory reasons for their decision not to appoint or hire Plaintiff.[8]

23

---

24 [7] This gracious treatment of Plaintiff's problematic comparators does not change the

25 outcome of the Court's decision because the issues surrounding the comparators also prove
fatal at the third prong of the *McDonnell Douglas* framework.  *See infra* Section III.A.3.

26 [8] As Defendants correctly highlight, (Doc. 165 at 2), Plaintiff's operative Complain asserts

27 only a failure-to-hire claim, (*see generally* Doc. 137), which he subtly changed to a failure-
to-appoint claim at the summary judgement stage, (see Doc. 156 at 2, 6.)  As Defendants

28 have produced legitimate, nondiscriminatory reasons for both claims, the Court will not
address the appropriateness (or inappropriateness) of Plaintiff's last-minute switch.

Thus, the burden now shifts back to Plaintiff to show that Defendants' proffered explanations are pretextual.  *Chuang*, 225 F.3d at 1124.

### 3.  Pretext

The Ninth Circuit has stated "that a plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  *Chuang*, 225 F.3d at 1127 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998), *as amended* (Aug. 11, 1998)).  Significantly, these two approaches are not mutually exclusive, and "a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper."  *Id.*

Here, Plaintiff attempts to establish pretext through both direct and indirect evidence.  Specifically, Plaintiff contends that he can establish discriminatory animus, and thereby pretext, with the following evidence: (1) a version of the HR Standard Operating Procedure—that was not in effect at the time of the recruitment for the open BSD position[9]—and a section of the Scottsdale Code, which combined *allow*, but do not *require*, a retired Scottsdale employee to be reemployed via direct appointment; (2) a 2000 AZAGO survey of the City of Tempe's Public Works Department, which attributes a derogatory statement about "Mexicans" to the unnamed "Senior Manager," (Doc. 157-6 at 27), who Plaintiff contends was Defendant Nichols;[10] (3) declarations from two former City of

---

[9] Plaintiff's *speculation* that "this section may have been deleted to prevent him from being appointed to the Business Services Director position" is just that: pure speculation.  (Doc. 156 at 10.)  There is no factual evidence to bolster this assertion, and the Court will not consider it.

[10] Plaintiff has not disclosed a witness who will testify in support of the claims made in the AZAGO report.  Additionally, this report constitutes hearsay-upon-hearsay, which *may* have an exception, *see* Fed. R. Evid. 803(8), but the Court declines to rule on the matter at this time.  Even if the evidence were admissible, and Plaintiff could prove that the unnamed "Senior Manger" was Defendant Nichols, a stray remark from a different job, 17 years before the events at issue here—though reprehensible—is not sufficient evidence of pretext.  *See Magsanoc v. Coast Hotels & Casinos, Inc.*, 293 F. App'x 454, 455 (9th Cir. 2008) (rejecting "stray remarks" as evidence of pretext when the remarks were not directed

Tempe employees, who allege that Defendant Nichols—then an employee of the City of Tempe—took no action after hearing colleagues utter racial epithets towards Hispanic employees, (Doc. 157-6 at 50–54); (4) an email sent by David Heyman alleging that—months after the decisions to neither hire, nor appoint Plaintiff—Defendant Nichols made a comment, while discussing the number of individuals with the last name "Lucero" who worked at the City, that the City "used to hire them off the street," (Doc. 157-6 at 48); and (5) the fact that Plaintiff received lower performance reviews and, thus, a slightly lower pay raise in fiscal year 2014–15 than did two "Anglo, female employees." (*See* Doc. 156 at 10–12.)

Defendants argue that Plaintiff has not proven pretext, in part, because he has not provided strong enough evidence to overcome the same-actor inference.[11]  In the Ninth Circuit, "where the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir.1996).  The same-actor inference is based upon the principle that "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005).  Thus, the inference may apply to actions other than hiring and firing, such as promotion or offers for less favorable job assignments. *Id.* at 1096–97.

Here, Defendant Nichols and Plaintiff discussed the plan to rehire Plaintiff as a contractor post-retirement, and Defendant Nichols did rehire Plaintiff.  (Doc. 143-3 at 62.)  Likewise, it was Defendant Nichols who neither appointed Plaintiff to the open BSD

---

towards the plaintiff, nor at any other employee at that place of employment, and it was unclear when the remarks were made).

[11] At oral argument, Defendants contended that the same-actor inference should apply even though they did not raise the argument in their briefing—although they contended that the underlying facts supporting this argument were included in their MSJ.  Plaintiff neither requested additional briefing on the matter, nor took issue with its being raised for the first time at oral argument.  Therefore, the Court will consider the argument.

position, nor hired him for that same position.  (*See id.* at 41–42 (establishing Defendant Nichols as the "hiring authority" for the position)).  Moreover, the time between Plaintiff's rehiring as a contractor and the allegedly discriminatory events was roughly a year, which is clearly a "short period of time" under Ninth Circuit caselaw.  *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir. 2000) (applying the same-actor inference where the positive action occurred more than a year earlier than the negative action).  Thus, the same actor inference applies to Defendant Nichols.

With the application of the same-actor inference, the Court must consider whether Plaintiff "has made out the strong case of bias necessary to overcome this inference." *Id.* at 1198.  He has not.  Under the burden created by this inference, Plaintiff's inability to provide sufficient comparators, *see supra* Section III.A.1., becomes an incurable ailment to his discrimination claim, *see Hawn*, 615 F.3d at 1158 (explaining that "[t]he concept of 'similarly situated' employees may be relevant to both the first and third steps of the *McDonnell Douglas* framework" and that Plaintiff's  burden on this subject is heightened "at the pretext stage"), which is only compounded by the evidentiary issues plaguing Plaintiff's purported evidence of pretext, *see supra* nn. 9–10.  Indeed, Plaintiff's failure to provide the Court with similarly situated individuals would be fatal to Plaintiff's discrimination claim even without the same-actor inference.  *Id.* at 1161 (upholding a district court's grant of summary judgment—sans the same-actor inference—where the Plaintiff failed to provide sufficient comparators).  And it is all the more lethal in the context of the same-actor inference because of the "strong inference" against a finding of discriminatory motive on the part of Defendants.  *Bradley*, 104 F.3d at 271.  Thus, the Court finds that Plaintiff has not presented the Court with sufficient evidence to rebut the same-actor inference.

Therefore, the Court finds that Plaintiff has failed to establish pretext, and that his discriminatory failure-to-hire and failure-to-appoint claims cannot survive.  Consequently, the Court will grant summary judgement for Defendants on these claims.

**B.  Retaliation Under Title VII**

Plaintiff contends that the early termination of his ARCO contract-extension in 2017 was retaliatory (the "2017 Retaliation Claim"), as was the City's decision to hire internally for the open BSD position in 2020 (the "2020 Retaliation Claim").  (Doc. 156 at 19.) Defendants argue that Plaintiff's 2017 Retaliation Claim is procedurally deficient, and that his 2020 Retaliation Claim fails as a matter of law.  The Court agrees with Defendants and will take each argument in turn.

1.  The 2017 Retaliation Claim

Defendants argue that Plaintiff's 2017 Retaliation Claims fails because (1) he never asserted such a claim in the operative Complaint; and (2) even if he had, Plaintiff has failed to exhaust his administrative remedies for that claim.[12]  (Doc. 149 at 20.)  The Court agrees.

*i.    Deficient Pleading*

In Plaintiff's SAC, he asserts the 2020 but not the 2017 Retaliation Claim.  (*See* Doc. 137 ¶¶ 39–41, 45–47.)  According to Plaintiff's SAC, he filed the First EEOC Charge of discrimination, and was issued a Notice of Right to Sue.  (*Id.* ¶ 39.)  Notably, the First EEOC Charge neither alleges the facts of a retaliation claim, nor marks the box for "retaliation" in the "cause of discrimination" section of the form.  (Doc. 143-5 at 9.) Plaintiff's SAC alleges that, "[a]s further evidence of discrimination and retaliation," the City conducted two separate internal recruitments for the open BSD position *in 2020*. (Doc. 137 ¶ 40.)  The next paragraph reads as follows: "Plaintiff asserts and therefore alleges that Defendant, City of Scottsdale retaliated against him for filing the above-identified discrimination charge and the lawsuit at bar."  (*Id.* ¶ 41.)

Thus, Plaintiff plainly alleges that (1) he filed the First EEOC Charge in 2017; (2) he filed this lawsuit; (3) because of those filings, Defendants chose to conduct an internal hiring in 2020, which would prevent Plaintiff from applying for the open position, and (4) by so doing, the Defendants retaliated against Plaintiff.  This is clearly a pleading for the

---

[12] Although Plaintiff argues that he did exhaust his administrative remedies, he fails to address Defendants' argument that his 2017 Retaliation Claim is not properly plead in the operative Complaint.  (*See* Doc. 156 at 17–18.)

2020 Retaliation Claim and not a pleading for the 2017 Retaliation Claim, which Plaintiff now attempts to pursue.   Consequently, the 2017 Retaliation Claim is procedurally deficient.

### ii.    Unexhausted Administrative Remedies

Even if Plaintiff had properly raised the 2017 Retaliation Claim, he has failed to exhaust his administrative remedies for that claim.   Before asserting a claim under Title VII, a plaintiff must exhaust his administrative remedies by first timely filing a charge of discrimination with the EEOC or an applicable state agency.   42 U.S.C. § 2000e-5(e)(1), (f)(1); *see also Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("As a precondition to the commencement of a Title VII action in court, a complainant must first file a charge with the [EEOC].").   Although "Title VII's charge-filing requirement is a processing rule," and not a jurisdiction one, it is nonetheless a "mandatory" rule.   *Fort Bend Cnty*, 139 S. Ct. at 1851.   A charge is timely filed under Title VII if it is filed within 180 days "after the alleged unlawful employment practice occurred."   42 U.S.C. § 2000e-5(e)(1).   This deadline is extended to 300 days if the plaintiff files a charge with an applicable state or local agency, as is the case here.   *Id.*

Plaintiff argues that his First EEOC Charge fulfills the administrative exhaustion requirements.   (Doc. 156 at 18.)   The events giving rise to the 2017 Retaliation Claim happened around August to September of 2017.   Plaintiff's First EEOC Charge was filed in October of 2017.   Thus, if that charge contained the necessary information, it could serve as the basis for his 2017 Retaliation Claim.   Defendants contend that it does not reference or allege retaliation in any way. (Doc. 149 at 21; Doc 165 at 12.)   They are correct.   Plaintiff neither marked the "retaliation" box to specify the cause of discrimination, nor did he mention retaliation—or events that could be construed as retaliation—in the narrative portion of the form.   (*See* Doc. 143-5 at 9.)

The Ninth Circuit has instructed that Title VII actions should be "neither interpreted too technically or applied too mechanically," and that a plaintiff must "describe the *facts* and the *legal theory* with sufficient clarity to notify the agency." *Ong v. Cleland*, 642 F.2d

316, 319 (9th Cir.1981) (citations omitted) (emphasis added).  Thus, "[i]f the claims are not within 'the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,' they must be dismissed for failure to exhaust administrative remedies." *Zhang v. Honeywell Int'l Inc.*, No. 06-1181-PHX-MHM, 2007 WL 2220490, at *3 (D. Ariz. Aug. 1, 2007) (quoting *Ong*, 642 F.2d at 319).

The instant case is exactly akin to *Zhang*, where the plaintiff—just as Plaintiff here—neither mentioned retaliation in the narrative portion of the EEOC charge, nor did she check the retaliation box.  *Id.*  There, the Court reasoned that "[w]ithout some sort of allegation of retaliation in her EEOC Charge or Intake Questionnaire, such an allegation is not reasonably expected to grow out of the charge of discrimination."  *Id.*  This led the *Zhang* Court to conclude that the plaintiff had failed to exhaust her administrative remedies for her retaliation claim.  *Id.*  The same reasoning applies here.  Nothing in Plaintiff's First EEOC Charge would alert the EEOC to any claims of retaliation by Plaintiff, nor is the retaliation allegation one that would be expected to grow out of the charge of discrimination on which Plaintiff's First EEOC Charge is premised.  Plaintiff's First EEOC Charge, therefore, does not satisfy the administrative exhaustion requirement, and he provides no other document that could do so.  Consequently, the Court finds that Plaintiff has failed to exhaust his administrative remedies for his 2017 Retaliation Claim.

Moreover, the Court is unpersuaded by Plaintiff's citation to a Second Circuit case for the proposition that "claims that were not asserted before the EEOC may be pursued in subsequent federal court action if they are reasonably related to those filed with the agency." (Doc. 156 at 18 (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).

First, *Legnani* addressed claims of retaliation for the very act of filing the EEOC charge.  274 F.3d 683.  Obviously, it is impossible for a plaintiff to allege retaliation *in* an EEOC charge when the retaliation happened *because of* that very EEOC charge—i.e., the retaliation happened after the charge was filed.  The situation contemplated by *Legnani* is not present here, where Plaintiff could have asserted retaliation in his First EEOC Charge,

but simply failed to do so.

Second, although the Ninth Circuit recognizes the "reasonably related" doctrine in the context of Title VII's exhaustion requirement, it requires that a plaintiff's claim be "so closely related [to the allegations made in the charge] that agency action would be redundant." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1102 (9th Cir. 2002) (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1457 (9th Cir. 1990)) (alterations original).  As explained above, nothing in Plaintiff's First EEOC Charge mentioned, or even hinted at, a possible retaliation claim.  The Court, therefore, cannot conclude that filing another EEOC charge, or including information about retaliation on the First EEOC Charge, would have been redundant.   Thus, Plaintiff has failed to exhaust his administrative remedies for the 2017 Retaliation Claim.  *See Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003) ("Construing his EEOC charge with utmost liberality, we conclude that it does not satisfy the exhaustion requirement.").

Because he failed to exhaust his administrative remedies for his 2017 Retaliation Claim, the claim is time barred.  *See Fort Bend Cnty*, 139 S. Ct. at 1846.  Therefore, the Court will grant summary judgment on this claim.

## 2.  The 2020 Retaliation Claim

Plaintiff alleges that the City retaliated against him in 2020 by conducting an internal recruitment for BSD position, which prevented him from applying for the position. (*See* Doc. 137 ¶¶ 39–41.)  This claim, like Plaintiff's other Title VII claim, is subject to the *McDonnell Douglas* burden-shifting framework.  *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986) (explaining that Title VII retaliation claims follow the "order and allocation of proof . . . outlined *in McDonnell Douglas*").  Accordingly, Plaintiff must first make out a prima facie case of retaliation.  *Id.* at 731.  He cannot.

"To establish a *prima facie* case of Title VII retaliation, a plaintiff must show '(1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action.'"  *Green v. City of Phoenix*, No. CV-15-02570-PHX-DJH, 2019 WL 4016484, at *9 (D. Ariz. Aug. 26, 2019) (quoting

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006)).  The causation prong is a heavy lift because a plaintiff must prove "that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360–62 (2013) (rejecting the "motivating-factor provision's lessened causation standard" in the retaliation context and holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation").  However, "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Here, Plaintiff contends that Judy Doyle's decision to hold an internal recruitment in 2020 was retaliation for Plaintiff's filing of the First EEOC Charge in 2017 and filing this lawsuit in 2019.  The Court assumes, without deciding, that Plaintiff's filing of the First EEOC charge and subsequent lawsuit was protected activity, and that excluding Plaintiff from applying for the BSD position—by holding an internal recruitment—was an adverse employment action.  However, Plaintiff's claim faulters at causation, where he must prove that but-for his filing of the First EEOC Charge and subsequent lawsuit, Ms. Doyle would not have conducted an internal recruitment—an activity which the City has conducted dozens of times in the past five years, (Doc. 143-2 at 77).  He cannot.

Plaintiff relies only on circumstantial evidence to prove causation, (Doc. 156 at 21), which is permissible, *see Yartzoff*, 809 F.2d at 1376.  He specifically relies on (1) Ms. Doyle's knowledge of Plaintiff's engagement in protected activity, and (2) the proximity of time between the protected activities and the adverse action.  (*See* Doc. 156 at 21.)

Defendants argue that Plaintiff's proffered circumstantial evidence fails to establish an inference of causation.  (*See* Doc. 165 at 14.)  They specifically contend that (1) Ms. Doyle had no knowledge of Plaintiff's actions and, therefore, her decision to conduct an internal recruitment could not have been motivated by animus toward Plaintiff; and (2)

even if she did know about Plaintiff's actions, the time-gap between the protected activity and the adverse action was too great to establish but-for causation.  (Doc. 149 at 22–23.) The Court is persuaded by the latter argument, but not the former.

First, although it is true that "[i]f the supervisor taking the allegedly retaliatory employment action does not know about a plaintiff's protected activity, the plaintiff cannot establish a 'causal link' between the challenged action and the protected activity," *Morrill v. Nielsen*, 2018 WL 3141798 at *12 (N.D. Ill. June 26, 2018) (quoting *Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto.*, 210 F.3d 750, 755 (7th Cir. 2000)), Plaintiff has provided evidence that Ms. Doyle knew about Plaintiff's protected activity because Ms. Doyle admitted to reading about it in a newspaper, (*see* Doc. 157-7 at 42).  Defendants contend that this is not strong enough evidence to overcome the non-discriminatory reason offered for Ms. Doyle's decision—that she wanted to recruit internally because of the strength of the City's workforce.  (*See* Doc. 165 at 14.)  However, this argument is better addressed at the pretext-stage of the *McDonald Douglas* burden-shifting analysis, not the prima facie stage.  *See Miller*, 797 F.2d at 730–31 (explaining the "order and allocation of proof" for making out a Title VII retaliation claim).  Viewing the evidence in the light most favorable to Plaintiff, as the Court must at the summary judgement stage, Defendants' argument that Ms. Doyle did not know about Plaintiff's protected conduct cannot serve as the grounds for a grant of summary judgment in their favor.

Second, Defendants are correct that temporal proximity is a hurdle to Plaintiff's ability to prove but-for causation.  The Ninth Circuit has long held that "in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000)).  Here, Plaintiff filed his First EEOC Charge in October of 2017 and his lawsuit in June of 2019, but the internal recruitment process was in October of 2020.  This means that the more recent of the two protected activities happened 16 months before the alleged adverse action, and the other happened three years before the adverse action.  These time

lapses do not support a finding of but-for causation.  *See, e.g.*, *id.* (finding that a nearly 18–month lapse, on its own, did not give rise to an inference of causation and collecting cases that held similarly regarding timeframes of four, five, and eight months).

The Court finds that Plaintiff has not provided enough circumstantial evidence to raise an inference of but-for causation.  Plaintiff's temporal proximity problem is damning to his case.  Additionally, the *only* piece of evidence he can provide to draw an inference of causation is that Ms. Doyle read a news article—more than a year before the adverse employment action—in which Plaintiff was reported to have sued the city for discrimination.  Though this is some indication that Ms. Doyle knew of Plaintiff's protected activity, it is not strong enough circumstantial evidence, on its own, to raise an inference of causation.  Therefore, Plaintiff has not established a prima facie case of retaliation, and his 2020 Retaliation Claim fails as a matter of law.  Consequently, the Court will grant summary judgement in favor of Defendants on this claim.

### C.  Section 1983 Equal Protection Claim

In their MSJ, Defendants argued that Plaintiff could not assert a class-of-one theory for an equal protection claim in the public employment context.  (Doc. 149 at 23–22.) Plaintiff failed to address this argument in his Response.  (*See generally* Doc. 156.) However, at oral argument, Plaintiff asserted that there is a contractor exception to the prohibition on raising a class-of-one theory in public employment discrimination suits. Plaintiff thusly contended that, because of his contractor-status when the alleged discrimination occurred, he was not prohibited from arguing a class-of-one theory.  After examining the governing authority, the Court finds that Plaintiff oversimplifies the matter.

The Supreme Court has recognized that, in certain circumstances, an equal protection claim may be maintained "even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has

been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").  But neither it, nor the Ninth Circuit, has opined on whether *government contractors* may advance this class-of-one theory. *Mountain Cascade Inc v. City & Cnty. of San Francisco*, No. C-13-03702 DMR, 2013 WL 6069010, at *4 (N.D. Cal. Nov. 18, 2013) ("Neither the Supreme Court nor the Ninth Circuit has addressed the question of whether government contractors may bring class-of-one equal protection claims.").

The Supreme Court has, however, plainly held that "the class-of-one theory of equal protection has no application in the *public employment context*." *Engquist*, 553 U.S. at 607 (emphasis added).  In *Engquist*, the Court found that employment decision-making differed significantly from the government's legislative or regulatory functions, where "the existence of a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." *Id.* at 602.  This is because employment decision-making is "often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify," *id.* at 604, and "government offices could not function if every employment decision became a constitutional matter," *id.* at 608 (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)).  These rationales fit easily into the government contractor context, where the only noticeable distinction is that the plaintiff-contractor is not employed directly by the government but by a private entity whom the government employs.  This Court does not find this to be a meaningful distinction.

Moreover, the Supreme Court has recognized that the "similarities between government employees and government contractors" are sometimes "obvious." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996).  For example, "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Id.*  Furthermore, "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Id.*  Because of these and other reasons, the Supreme Court has

turned to its "government employment precedents for guidance" when addressing issues in the government contractor context. *Id.* Thus, this Court is persuaded that application of *Enquist* to the government-contractor relationship is appropriate—and this Court is not alone in that conclusion.

Although the Ninth Circuit has yet to opine on *Enquist*'s application in the government contractor context, several courts—including many in this circuit—have found that *Enquist*'s rationales apply neatly in the government contractor context and, consequently, have extended *Enquist*'s holding to prohibit government contractors from advancing a class-of-one theory in equal protection suits. *See, e.g.*, *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) ("We have little trouble applying the reasoning in *Engquist*, directed at the government-employee relationship, to the circumstances in this case involving a government-contractor relationship."); *Mountain Cascade Inc*, 2013 WL 6069010, at *5 ("It is this exercise of discretionary decision-making that *Engquist* and *Douglas Asphalt* held is immune from a constitutional challenge, and the court is persuaded that *Engquist* applies to government-contractor relationships for the same reason that it applies to government-employee relationships."); *Chandola v. Seattle Hous. Auth.*, No. C13-557 RSM, 2014 WL 4540024, at *2 (W.D. Wash. Sept. 11, 2014) (finding, within the context of a government-contractor relationship, that "this matter falls within the *Enquist* prohibition against class-of-one equal protection claims in the public employment context involving subjective and individualized personnel decisions"); *Mazzeo v. Gibbons*, No. 2:08-CV-01387-RLH, 2010 WL 4384207, at *7 (D. Nev. Oct. 28, 2010*), aff'd sub nom. Mazzeo v. Young*, 510 F. App'x 646 (9th Cir. 2013) ("The Court agrees with the sound reasoning of other district and circuit courts and concludes that the class-of-one doctrine should not extend to forms of state action which involve discretionary decision-making."); *Beans & Rocks LLC v. Pac. Cnty.*, No. 3:21-CV-05528-DGE, 2022 WL 1154308, at *4 (W.D. Wash. Apr. 19, 2022) (applying *Douglas Asphalt*'s extension of *Engquist* to find that the plaintiff "fail[ed] to state a cognizable equal protection claim against [government defendants] because of their government-contractor relationship").

Therefore, the Court finds that the class-of-one theory of equal protection is inapplicable in the government contractor context.  Thus, Plaintiff's equal protection claim fails under this theory, and he provides no other theory to support his claim.[13] Consequently, the Court will grant summary judgment for Defendants on this claim.

### D. Punitive Damages

The parties argue about the appropriateness of punitive damages.  (*See* Doc. 149 at 25; Doc. 156 at 28; Doc. 165 at 17.)  However, because the Court will grant summary judgment in favor of Defendants for every claim asserted by Plaintiff, the issue of punitive damages is moot.  Therefore, the Court declines to rule on the issue.

## IV.   CONCLUSION

Therefore,

**IT IS ORDERED** granting Defendants MSJ in accordance with this order.  (Doc. 149.)

**IT IS FURTHER ORDERED** instructing the Clerk to enter judgment and terminate this case.

Dated this 31st day of May, 2022.

Honorable Susan M. Brnovich
United States District Judge

---

[13] Plaintiff's Response is suggestive of a potential claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (Doc. 156 at 127–28.)  However, as Defendants correctly note, Plaintiff neither pled nor disclosed such a claim.  (*See generally* Doc. 137 (making no reference to *Monell* generally or to any policy or custom specifically); Doc. 143-5 at 18–32 (same)).  Moreover, when asked at oral argument about whether Plaintiff was attempting to raise a *Monell* claim or simply using *Monell* caselaw to bolster his equal protection claim, Plaintiff's Counsel was unable to provide the Court with a clear answer.  Thus, the Court finds that Plaintiff has not properly plead a *Monell* claim and will not address this issue further.